# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

RUSSELL T. HAWLEY and HAWLEY INSURANCE, INC.,

    Defendants.

No. C 06-4087-MWB

**MEMORANDUM OPINION AND ORDER REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT**

_____

## TABLE OF CONTENTS

**I. INTRODUCTION** ........................................... 2
   *A. Factual Background* ................................... 2
   *B. Procedural Background* ............................... 8

**II. LEGAL ANALYSIS** ........................................ 10
   *A. Standards For Summary Judgment* ...................... 10
   *B. The False Claims Act Claims* ......................... 14
      *1. Pertinent provisions of the FCA* ................ 14
      *2. The "false claims" claim pursuant to § 3729(a)(1)* ....... 19
         *a. Elements of the claim* ...................... 19
         *b. The government's § 3729(a)(1) claim* ........... 22
      *3. The "false record or statement" claim pursuant to § 3729(a)(2)* ............................... 29
         *a. Elements of the claim* ...................... 29
         *b. The government's § 3729(a)(2) claim* ........... 30
      *4. The "conspiracy" claim pursuant to § 3729(a)(3)* ........ 37
         *a. Elements of the claim* ...................... 37
         *b. The government's § 3729(a)(3) claim* ........... 38
   *C. The Common Law Claims* ............................. 39
      *1. The fraud claim* ................................ 39

   *a.*  *Elements of the claim* . . . . . . . . . . . . . . . . . . . . . . 39
   *b.*  *Hawley's challenges to the claim* . . . . . . . . . . . . . . 40
  *2.*  *The "payment under mistake of fact" claim* . . . . . . . . . . . 46

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Ⅰn this civil action, the United States asserts that the defendant insurance agent and his company participated in a scheme to obtain federally reinsured crop insurance payments for persons not eligible for such benefits. Therefore, the United States has brought claims pursuant to 31 U.S.C. § 3729(a)(1), (a)(2), and (a)(3) of the False Claims Act, as well as common-law claims of fraud and payment under mistake of fact. The United States and the defendants have filed cross-motions for summary judgment on the False Claims Act claims, and the defendants have also moved for summary judgment on the common-law claims. Among other disputes, the parties' cross-motions for summary judgment reveal some fundamental disagreements about the scope of the False Claims Act, which the court must attempt to resolve.

## I. INTRODUCTION

### A. Factual Background

The court will not attempt here an exhaustive dissertation on the undisputed and disputed facts in this case. Rather, the court will set forth sufficient of the facts, both undisputed and disputed, to put in context the parties' arguments concerning the cross-

motions for summary judgment.[1]  Additional factual allegations and the extent to which they are or are not disputed will be discussed, if necessary, in the court's legal analysis.

The United States administers a federal crop insurance program pursuant to the Federal Crop Insurance Act (the Act) through the Risk Management Agency (RMA), an agency of the United States Department of Agriculture (USDA).  Multi-Peril Crop Insurance (MPCI), which is made available pursuant to the Act, provides crop insurance coverage against crop losses caused by nature.  Private insurance companies actually sell and service MPCI policies pursuant to the Act, and agents receive commissions for the policies that they write for such private insurance companies.  The Federal Crop Insurance Corporation (FCIC), a wholly-owned government corporation, then subsidizes the MPCI program by subsidizing part of the premium paid by farmers and by reimbursing the private insurance companies for indemnity payments made to insured farmers in accordance with the terms and conditions set forth in a Standard Reinsurance Agreement.

To obtain MPCI, or other federally insured crop insurance, the farmer must have a bona fide interest in the crop at the time coverage begins, sign an application for such insurance, and submit the application through an insurance agent.  The insurance provider then reviews the application to determine whether the application is for a producer who has

---

[1] The court's ability to develop a coherent factual background for the present litigation is hampered by various lacunae in the parties' recitations of fact and the failure of the United States to respond, in the manner required by N.D. IA. L.R. 56(d), to the defendants' statement of additional facts (docket no. 24-3) in response to the motion for summary judgment by the United States, which the defendants had filed pursuant to N.D. IA. L.R. 56(b)(3).  Because the United States has failed to respond to the defendants' allegations in their statement of additional facts, those allegations are deemed admitted for purposes of this summary judgment ruling.  *See* N.D. IA. L.R. 56(d) ("The failure to reply, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact.").

a bona fide interest in the crop, shows the correct person or entity as the insured, has been signed by a person having authority to enter into a binding contract, and contains all the material information required to insure the crop. If these requirements are met, the insurance provider may accept the application and issue a crop insurance policy.

Each year, an insured farmer must report and certify on an acreage report all planted acreage of the insured crop in each county in which the farmer has an interest or share. The insurance company then accepts the acreage report and sends the agent or the insured farmer a Schedule of Insurance, which shows the coverage for the certified acres. The agent is required to review the information on the Schedule of Insurance for accuracy, and if errors are found, the agent must contact the insurance provider to have the errors corrected. When damage covered by the policy occurs to an insured crop, the insured farmer notifies his crop insurance agent who, in turn, notifies the insurance company. The insurance company assigns a loss adjuster to inspect the crop to determine the amount of loss. The loss adjuster completes a production worksheet based on the adjuster's investigation and information provided by the insured farmer, which includes the cause of loss or damage, the amount of harvested and appraised production, and the farmer's percent share or interest in the insured crop. The insured farmer and the adjuster both sign the production worksheet certifying that the information contained on the completed production worksheet is true and correct. The certification states, *inter alia*, that the insured "understand[s] that this crop insurance is subsidized and reinsured by the Federal Crop Insurance Corporation, an agency of the United States, and that [the farmer] may be prosecuted under applicable provisions of the Criminal Code of the United States for knowingly or willfully making false statements or filing false reports. . . ." Plaintiff's Appendix at 29. The information on the production worksheet is then used to determine

the amount of loss that the insurance provider pays and for which the insurance provider is then reimbursed by the FCIC.

One of the private insurance companies selling and servicing MPCI insurance subject to a Standard Reinsurance Agreement in 2000 and 2001 was North Central Crop Insurance (NCCI). One of the agents of NCCI at that time was defendant Russell T. Hawley. Hawley had previously been a crop insurance adjuster for NCCI, but had opened his own crop insurance agency, defendant Hawley Insurance, Inc., in Vail, Iowa, in 1994. Where appropriate, the court will refer to the defendants collectively simply as "Hawley."

This lawsuit arises from federally reinsured crop insurance policies sold by Hawley and issued by NCCI to various farmers for crop years 2000 and 2001 for 4,500 acres of crop land in Tripp and Mellette Counties, near Winner, South Dakota. For the sake of convenience, the court will call this land "the South Dakota Crop Land" throughout this ruling.

Hawley knew that, at some time prior to 2000, Ed Marshall had purchased the South Dakota Crop Land and that, at some point, Mark Hoffman had rented that land from Ed Marshall. Hawley denies that he knew the terms of the rental or lease agreement between Mark Hoffman and Ed Marshall. Russell Hawley admits, however, that in 1998, he traveled with Hoffman to Winner, South Dakota, to view the South Dakota Crop Land, as both a friend and a crop insurance agent. Russell Hawley also admits that, in 1998 or 1999, he obtained a South Dakota crop insurance license, so that he could write MPCI and private hail insurance policies on the South Dakota Crop Land. The parties also agree that, in July 2000, Russell Hawley traveled to the South Dakota Crop Land with Donald Kluver. Although no party has explained precisely what relationship Kluver had to Mark Hoffman or Ed Marshall, the government contends that Hawley knew or should have

known that Kluver was actually farming the South Dakota Crop Land in 2000, which Hawley denies.

On February 24, 2000, Hawley submitted to NCCI a crop insurance application for the 2000 crop year in the names of Sydney and Stanley Windquist for an interest in crops on the South Dakota Crop Land. Hawley alleges that the application was for Crop Revenue Coverage (CRC), not MPCI, as alleged by the United States, and the United States has failed to dispute that contention. However, the parties have not shown the court that any issue in this case is changed or disposed of if the application was for CRC rather than MPCI. In any event, the United States alleges that the application was false, because the Windquists had no eligible interest in the crop land. The government alleges, further, that Hawley knew or should have known that the application was false, because Hawley knew that Sydney Windquist was Don Kluver's hired hand and that Stanley Windquist was a high school teacher. Hawley maintains, however, that it knew or believed that the Windquists had secured financing from Ag Services to farm the South Dakota Crop Land, that they had engaged Don Kluver to provide the equipment and inputs necessary to farm that land, and that the Windquists had farming experience from working on their family farm and from Sydney Windquist's experience managing farmland for Don Kluver. On June 16, 2000, Hawley submitted to NCCI the Windquists' acreage reports for crop insurance purposes, which the United States alleges were false. Subsequently, the Windquists submitted production worksheets claiming crop losses on the South Dakota Crop Land, as the result of which NCCI paid crop insurance indemnities. The FCIC ultimately reimbursed NCCI for crop insurance indemnities and paid premium subsidies totaling $145,540 for the 2000 crop year.

The Windquists and Don Kluver were later prosecuted for conspiring to make fraudulent crop insurance claims relating to the South Dakota Crop Land for crop year

2000. Kluver entered into a plea agreement and the Windquists entered into pretrial diversion agreements. The government maintains that these dispositions of the criminal charges against Kluver and the Windquists establish that the crop insurance applications, reports, and claims for the 2000 crop year were false and fraudulent.

On March 14, 2001, just before the March 15, 2001, deadline for crop insurance applications for the 2001 crop year, Hawley submitted to NCCI an application for crop insurance for the South Dakota Crop Land in the name of, and purportedly signed by, Ed Marshall. The application had been hand-delivered to Hawley by Mark Hoffman, so Hawley had not seen Marshall sign the application. Again, Hawley contends that the application was for CRC, not MPCI, but, again, neither party explains what, if any, difference that fact would make to the present litigation. In a subsequent settlement agreement with the United States, Marshall admits that he did not sign any such application and, indeed, stated that he was surprised to learn from Hawley in April 2001 that he had crop insurance for the South Dakota Crop Land. On June 30, 2001, Hawley submitted to NCCI acreage reports for the South Dakota Crop Land in the name of Ed Marshall that the United States alleges were false, because Marshall was not eligible for crop insurance, where he had not signed a timely application for crop insurance nor had he instructed anyone to sign such an application on his behalf. Subsequently, production worksheets for damages to the crops on the South Dakota Crop Land for the 2001 crop year were submitted to NCCI for payment. NCCI made indemnity payments for crop losses and later received reimbursement from the FCIC for those payments. The government alleges that the FCIC eventually made overpayments totaling $159,960 for indemnity payments for the claimed losses and premium subsidies on the South Dakota Crop Land for the 2001 crop year.

On June 13, 2005, Ed Marshall signed a civil settlement agreement with the United States Attorney's Office for the Northern District of Iowa pursuant to which he repaid part of the overpayment alleged. The United States maintains that the civil settlement agreement with Ed Marshall establishes that the crop insurance applications, reports, and claims for the 2001 crop year were false and fraudulent.

## B. *Procedural Background*

On October 16, 2006, the United States filed the Complaint (docket no. 1) in this action asserting several claims against defendants Russell T. Hawley and Hawley Insurance Company. In **Count One**, the United States asserts a claim pursuant to 31 U.S.C. § 3729(a)(1) of the False Claims Act alleging that the defendants knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval. In **Count Two**, the United States asserts a claim pursuant to 31 U.S.C. § 3729(a)(2) of the False Claims Act alleging that the defendants knowingly made, used, or caused to be made or used false records or statements in order to get false or fraudulent claims paid or approved by the United States. In **Count Three**, the United States asserts a claim pursuant to 31 U.S.C. § 3729(a)(3) of the False Claims Act alleging that the defendants conspired with others to get false or fraudulent claims allowed or paid by the United States in that the defendants entered into an agreement to submit and process false and fraudulent information in order for ineligible individuals to receive indemnities that would ultimately be reimbursed by the United States through the Federal Crop Insurance Corporation (FCIC). In **Count Four**, the United States alleges that the defendants engaged in common-law fraud by making or using false records and statements or by concealing the true facts surrounding the individuals actually owning the farmland on which MPCI policies were issued and claims were made, knowing that the misrepresentations or

concealments were material and knowing and intending that the United States would rely upon them, thereby causing the United States damages. Finally, in **Count Five**, the United States asserts a claim of "payment under mistake of fact" alleging that the United States paid crop insurance indemnities and premium subsidy benefits under the erroneous belief that the persons receiving those benefits were eligible for them, causing the United States damages. On the False Claims Act claims, the United States seeks treble damages and civil penalties of up to $11,000 for each false or fraudulent claim or false statement. On the common-law claims, the United States seeks damages, interest and costs, and on the common-law fraud claim, punitive damages. The defendants filed a joint Answer (docket no. 3) on November 8, 2006, denying the claims by the United States and asserting various affirmative defenses. Trial in this matter was set to begin on April 7, 2008, but owing to conflicts with criminal cases also set for trial on the court's trailing docket, trial in this matter has now been continued to June 30, 2008.

This matter comes before the court pursuant to the government's December 28, 2007, Motion For Summary Judgment Or In The Alternative Partial Summary Judgment (docket no. 16) and the defendants' December 28, 2007, Motion For Summary Judgment (docket no. 17). The government seeks summary judgment on its False Claims Act claims, while Hawley seeks summary judgment on all of the claims asserted by the government. The parties filed resistances to their opponents' motions and replies in further support of their own motions, so that all issues raised in the motions have now been fully briefed. *See* Plaintiff's Response To Defendants' Motion For Summary Judgment (docket no. 21); Defendants' Resistance To Plaintiff's Motion For Summary Judgment (docket no. 24); Defendants' Reply To Plaintiff's Resistance To Defendants' Motion For Summary Judgment (docket no. 25); Plaintiff's Reply To Defendants' Response To Plaintiff's Motion For Summary Judgment And/Or Partial Summary Judgment (docket no. 27).

The court heard oral arguments on the parties' cross-motions for summary judgment on Tuesday, March 25, 2008. At the oral arguments, the United States was represented by Assistant United States Attorney Martha A. Fagg of the United States Attorney's Office for the Northern District of Iowa in Sioux City, Iowa. Defendants Russell T. Hawley and Hawley Insurance, Inc., were represented by Bruce B. Green of Willson & Pechacek, P.L.C., in Council Bluffs, Iowa.

These matters are now fully submitted.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1982 (2007); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Any party may move for summary judgment regarding "all or any part" of the claims asserted in a case. FED. R. CIV. P. 56(a), (b) (allowing a claimant to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party," and allowing a defending party to move for summary judgment "at any time"). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." *Id.* 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there

are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.* An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence"). Evidence presented by the nonmoving party that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, such as a "scintilla of evidence," *Anderson*, 477 U.S. at 252; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997), or evidence that is "merely colorable" or "not significantly probative," *Anderson* at 249-50, does not make an issue of material fact genuine.

Thus, a *genuine issue of material fact* is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence*, 358 F.3d 982, 985 (8th Cir. 2004). "'Instead, "the dispute must be outcome determinative under prevailing law."'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910-11 (8th Cir. 2005) (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992), in turn quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). In other words, a genuine issue of

material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id.* at 249. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

Procedurally, the moving party does not have to "support its motion with affidavits or other similar materials *negating* the opponent's claim," *Celotex*, 477 U.S. at 323, but the moving party does bear "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Thus, a movant need only demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley*, 415 F.3d at 910 ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))). Thus, the movant must show the absence of a genuine issue of material fact as it relates to the substantive law, and the nonmovant must show the alleged issue of fact is genuine and material as it relates to the

substantive law.  If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 322; *In re Temporomandibular Joint*, 113 F.3d at 1492.

In considering whether a genuine issue of material fact is present the court must view all the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88; *Mosley*, 415 F.3d at 910.  Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587-88.  However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather than "attempt[ing] to determine the truth of the matter . . . the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

Of course, the facts are not the sole concern of the court; after all, a genuine issue of material fact necessarily depends on the substantive law. *See Holloway*, 884 F.2d at 366 ("The presence of a genuine issue of fact is predicated on the existence of a legal theory which can be considered viable under the nonmoving party's version of the facts. The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law.").  Moreover, summary judgement is particularly appropriate "where the unresolved issues are primarily legal rather than factual." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996).  But even if no genuine issue of material fact is present in a case, summary judgment is not appropriate unless the governing law supports the moving party's position. FED. R. CIV. P. 56(c) (requiring the moving party to also show that it "is entitled

to judgment as a matter of law"). Furthermore, "the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson*, 477 U.S. at 252; *see Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998) ("'In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.'" (quoting *Hartnagel*, 953 F.2d at 396)). Therefore, the court will first address the standards for proof involved in each claim in this litigation before considering whether either party is entitled to summary judgment on that claim.

## B. The False Claims Act Claims

### 1. Pertinent provisions of the FCA

As a general matter, the False Claims Act (FCA) "prohibits false or fraudulent claims for payment to the United States, 31 U.S.C. § 3729(a), and authorizes civil actions to remedy such fraud to be brought by the Attorney General, § 3730(a), or by private individuals in the Government's name, § 3730(b)(1)." *Rockwell Int'l Corp. v. United States*, 127 S. Ct. 1397, 1403 (2007); *Graham County Soil & Water Conservation Dist. v. United States ex rel Wilson*, 545 U.S. 409, 411 (2005); *Green v. City of St. Louis, Mo.*, 507 F.3d 662, 667 (8th Cir. 2007).[2] Persons who make such false or fraudulent claims

---

[2]The Eighth Circuit Court of Appeals has found that heightened pleading requirements are applicable to FCA claims pursuant to § 3729(a):

> Because the FCA is an anti-fraud statute, complaints alleging violations of the FCA must comply with Rule 9(b). *United States ex rel. Kinney v. Stoltz,* 327 F.3d 671, 674 (8th Cir. 2003). Under Rule 9(b), "the circumstances constituting

(continued...)

are liable for civil penalties and treble damages. *Graham County Soil & Water Conservation Dist.*, 545 U.S. at 411. After Congress amended the FCA in 1986 to raise the penalty from $2,000 to the current range of $5,000 to $10,000, and raised the ceiling on damages recoverable under § 3729(a) from double to treble, the Supreme Court described the change "as turning what had been a 'remedial' provision into an 'essentially punitive' one." *Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 130 (2003) (quoting *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529

---

[2](...continued)

> fraud . . . shall be stated with particularity." Rule 9(b)'s "particularity requirement demands a higher degree of notice than that required for other claims," and "is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations." *United States ex rel. Costner v. URS Consultants, Inc.,* 317 F.3d 883, 888 (8th Cir. 2003) (citing *Abels v. Farmers Commodities Corp.,* 259 F.3d 910, 920-21 (8th Cir. 2001)). To satisfy the particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result. *See, e.g., Corsello,* 428 F.3d at 1012; *Schaller Tel. Co. v. Golden Sky Sys., Inc.,* 298 F.3d 736, 746 (8th Cir. 2002). Put another way, the complaint must identify the "who, what, where, when, and how" of the alleged fraud. *Costner,* 317 F.3d at 888 (citing *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 550 (8th Cir. 1997)).

*United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006). The parties' cross-motions for summary judgment on the government's FCA claims do not turn on sufficiency of the pleading of those claims, however.

U.S. 765, 784 (2000), and citing False Claims Amendments Act of 1986, Pub. L. 99-562, § 2(7), 100 Stat. 3153.).

More specifically, the provisions of the FCA at issue here impose liability for fraudulent conduct as follows:

> **(a) Liability for certain acts.**—Any person who—
>
> > **(1)** knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
> >
> > **(2)** knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
> >
> > **(3)** conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;
> >
> > * * *
>
> > is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. . . .

31 U.S.C. § 3729(a)(1)-(3). The penalties have been adjusted by the Federal Civil Monetary Penalties Inflation Adjustment Act of 1990, so that, effective on or after September 29, 1999, the penalties under § 3729(a) of the False Claims Act are $5,500 to $11,000. 28 C.F.R. § 85.3(a)(9).

As the Sixth Circuit Court of Appeals has explained, a § 3729(a)(1) claim is distinguished from claims under subsections (a)(2) and (a)(3) in that it requires proof that a "claim" was "presented" to the government *for approval or payment*, but does not

require that the claim was *actually paid or approved*. *See United States ex rel. Sanders v. Allison Engine Co., Inc.*, 471 F.3d 610, 617-18 (6th Cir. 2006).[3] The Sixth Circuit Court of Appeals explained, further, that "[e]vidence that a claim was presented is necessary under this section because without it, there would be nothing to tie the claim to the government (as no government money was expended)." *Id.* The court explained the distinct nature of claims under subsections (a)(2) and (a)(3), as well, as follows:

> In contrast [to subsection (a)(1)], for liability to attach under subsection (a)(2), it is not sufficient to allege that the claim was merely submitted for payment. Rather, the claim must have been *"paid or approved"* by the government. Evidence that the claim has been "paid or approved" provides a sufficient link to the government; evidence that a claim was actually presented to the government is not necessary. *Cf. United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1003 (9th Cir. 2002) ("[The FCA] requires a real false claim, either in the form of the false claim itself or evidence sufficient to identify such a claim."). Subsection (a)(3) covers still different conduct—a conspiracy to defraud the government using false claims. Each subsection of § 3729(a) covers distinct conduct without reading language into the statute.

*Sanders*, 471 F.3d at 618 (emphasis in the original).

The statute defines "knowing and knowingly" for purposes of claims under § 3729(a), as follows:

> **(b) Knowing and knowingly defined.**—For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information—

---

[3]For reasons that pass understanding, this case is identified in the "headers" in the bound version as "UNITED STATES EX REL. THACKER" rather than "UNITED STATES EX REL. SANDERS." Sanders, however, is the first named "relator" and the "relator" whose name is used in the case caption of the on-line version.

**(1)** has actual knowledge of the information;

**(2)** acts in deliberate ignorance of the truth or falsity of the information; or

**(3)** acts in reckless disregard of the truth or falsity of the information,

and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b).  Finally, for present purposes, the statue defines a "claim" as follows:

**(c) Claim defined.**—For purposes of this section, "claim" includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c).

Liability under § 3729(a)(1), (a)(2), and (a)(3) is not limited to persons with a direct contractual relationship with the United States.  Rather, "[w]ithout question, the first three subsections of 31 U.S.C. § 3729(a) are broad enough to 'reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government.'" *United States v. Taber Extrusions, LP*, 341 F.3d 843, 845 (8th Cir. 2003) (quoting *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 544-45 (1943)).  Thus, if the person against whom such a claim is made did not have a direct contractual relationship with the United

States, the Eighth Circuit Court of Appeals has explained that the issue is whether that person "knowingly assisted" another's fraud. *Id.*

As to the "knowledge" requirement, the Eighth Circuit Court of Appeals has explained the following:

> The Act defines "knowingly" to mean actual knowledge that the information was untrue or deliberate ignorance or reckless disregard of the truth or falsity of that information. *See* 31 U.S.C. § 3729(b). "However, innocent mistakes and negligence are not offenses under the Act. . . . In short, the claim must be a lie." *United States ex rel. Quirk v. Madonna Towers, Inc.,* 278 F.3d 765, 767 (8th Cir. 2002) (quotations omitted). Thus, to hold [a defendant] liable, either as a conspirator or as one who caused [another's] false claims to be made, the government must prove that [the defendant] knew that [the other person] would use [documents supplied by the defendant] in a manner which would cause the facts represented or omitted in the [documents] to defraud the United States. *See Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.,* 276 F.3d 1032, 1053 (8th Cir.), *cert. denied,* 537 U.S. 944, 123 S. Ct. 345, 154 L. Ed. 2d 252 (2002); *Hindo v. Univ. of Health Sciences/Chicago Med. Sch.,* 65 F.3d 608, 613 (7th Cir. 1995), *cert. denied,* 516 U.S. 1114, 116 S. Ct. 915, 133 L. Ed. 2d 846 (1996).

*Taber Extrusions, LP*, 341 F.3d at 845.

The court will consider the government's FCA claims under each of the three pertinent provisions in turn.

### 2.   The "false claims" claim pursuant to § 3729(a)(1)

#### a.   Elements of the claim

In **Count One**, the government asserts a claim pursuant to § 3729(a)(1), which prohibits any person from "knowingly *present[ing], or caus[ing] to be presented,* to an officer or employee of the United States Government or a member of the Armed Forces

of the United States *a false or fraudulent claim for payment or approval.*" 31 U.S.C. § 3729(a)(1) (emphasis added); *United States ex rel Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 767 (8th Cir. 2002). The Eighth Circuit Court of Appeals has identified the elements of the government's "*prima facie* case" under this provision as requiring proof of the following: (1) the defendant made a claim against the United States; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent. *Madonna Towers, Inc.*, 278 F.3d at 767 (citing *United States ex rel. Norbeck v. Basin Elec. Power Coop.*, 248 F.3d 781, 803 (8th Cir. 2001)).

The court does not find the formulation of the elements of a § 3729(a)(1) claim in *Madonna Towers* to be well-suited to the present case, however, for several reasons. First, the pertinent provision is not cast in terms of having "made" a claim, but in terms of having "present[ed]" a claim, or having "cause[d] [a claim] to be presented." 31 U.S.C. § 3729(a)(1). The pertinent provision also specifically states that the claim must be "present[ed] . . . to an officer or employee of the United States Government or a member of the Armed Forces of the United States," not just more generally "to the United States." *See* 31 U.S.C. § 3729(a)(1); *and compare id.* at § 3729(a)(2)(imposing liability on one who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government"); *id.* at § 3729(a)(3) (imposing liability on one who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid"); *see also Sanders*, 471 F.3d at 618 (§ 3729(a)(1) requires that the claim be presented to a government officer or employee, not that the claim actually be paid). It is a familiar canon of statutory interpretation "that 'when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'" *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 357 (2005) (quoting *Sosa v. Alvarez-Machain,*

20

542 U.S. 692, 711 n. 9 (2004), in turn quoting 2A N. Singer, STATUTES AND STATUTORY CONSTRUCTION § 46:06, p. 194 (6th ed. 2000)); *accord United States v. Gonzales,* 520 U.S. 1, 5 (1997) ("'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion'"); *Russello v. United States,* 464 U.S. 16, 23 ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship"). Thus, the differences in language among the first three subsections of § 3729(a) must be construed to give those subsections different import. One difference is that § 3729(a)(1) requires that a claim be "presented . . . to an officer or employee of the United States Government or a member of the Armed Forces of the United States for payment or approval," but subsections (a)(2) and (a)(3) do not. *See Sanders,* 471 F.3d at 617-18. As shall be seen below, this "presentment" requirement has special significance.

Second, the "caus[ed] to be presented" language appears to be the language that the Supreme Court and the Eighth Circuit Court of Appeals recognized was "broad enough to 'reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government.'" *Taber Extrusions, LP*, 341 F.3d at 845 (quoting *Hess,* 317 U.S. at 544-45). While the formulation in *Madonna Towers* fits the circumstance in which the defendant allegedly had a direct contractual relationship with the government—that is, the circumstance in which the defendant presented its *own* claim to a government officer or employee for payment or approval—it does not fit the circumstance, at issue here, in which the claim that was presented was not the defendant's own claim, but the claim of another person with a direct contractual relationship with the

government—that is, a situation in which the defendant may have knowingly assisted *another person* to "present" *that other person's* claim for payment or approval. To account for such a situation, the first element of the government's claim must include a "knowingly assisted" alternative, because the defendant's liability may turn on proof that the defendant "knowingly assisted" another to submit false claims. *See Taber Extrusions, LP*, 341 F.3d at 845 (recognizing liability under § 3729(a)(1) for one who "knowingly assisted" another to make a false claim, even if the defendant had no direct contractual relationship with the government).

Under the circumstances presented here, therefore, the court concludes that a proper formulation of the elements of the government's claim under § 3729(a)(1) is the following: (1) the defendant presented a claim or knowingly assisted another to present a claim to an officer or employee of the United States Government or a member of the Armed Forces of the United States for payment or approval; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent. *Cf. Madonna Towers, Inc.*, 278 F.3d at 767 (casting the first element in terms of "making" a claim against the United States); 31 U.S.C. § 3729(a)(1) (casting the prohibition in terms of "presenting" a claim against an officer or employee of the United States); *Taber Extrusions, LP*, 341 F.3d at 845 (recognizing liability under § 3729(a)(1) for one who "knowingly assisted" another to make a false claim, even if the defendant had no direct contractual relationship with the government); *see also Sanders*, 471 F.3d at 617-18 (further defining the unique requirements of § 3729(a)(1)).

### b.     The government's § 3729(a)(1) claim

The government asserts that it can establish, as a matter of law, each of the elements of its claim under § 3729(a)(1), so that it is entitled to summary judgment on this claim. Hawley, on the other hand, contends that it is entitled to summary judgment on this claim,

because the government cannot, as a matter of law, establish the "presentment" and "claim" requirements of the first element of the claim or the final "knowledge" element of the claim.

As construed above, the first element of the government's (a)(1) claim requires the government to prove that the defendant *presented a claim* or *knowingly assisted another to present a claim* to an officer or employee of the United States Government or a member of the Armed Forces of the United States for payment or approval. The government asserts that there is no genuine dispute that Hawley "presented" false claims by certifying and submitting false insurance applications, acreage reports, and production worksheets, which led to the payment of crop insurance benefits.

On the other hand, Hawley argues that, even if any of the documents in question constituted "claims," it did not "certify" any of them; instead, Hawley simply transmitted them to NCCI, which is not "presentment," citing *United States v. Ekelman & Associates, Inc.*, 532 F.2d 545, 548-49 (6th Cir. 1976), and *United States v. Bornstein*, 423 U.S. 303 (1976). Hawley also argues that none of the documents were "presented" to an officer or employee of the United States; the documents in question were only "presented" to a private insurance company. Hawley argues that "presenting" a claim to a private entity, even one that receives government funds, is not the same as "presenting" it to an officer or employee of the government, citing *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 363 U.S. App. D.C. 180 (D.C. Cir. 2004).

The government counters that Hawley signed and submitted false documents to NCCI for processing, where he was an agent of NCCI, and NCCI then submitted the false claims to the FCIC for reimbursement, which the government describes as "presentment in its purest form." The government also argues that *Totten*, on which Hawley relies, has not been followed by other courts, which have found, instead, that where the funds to pay

the claim came from the government and the government "paid or approved" the claim, the claim did not actually have to be presented to the government. The government also argues that the "causes to be presented" language in § 3729(a)(1) ensnares one who knowingly transmits fraudulent claims. The government argues that the purpose of the FCA is to protect the funds and property of the government from fraudulent claims, regardless of the particular form or function of the government instrumentality upon which such claims were made, citing *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968).

The court finds that the reasoning in *Totten* is dispositive of the § 3729(a)(1) claim in this case. In *Totten*, in a decision by then Judge Roberts, now Chief Justice Roberts of the United States Supreme Court, the District of Columbia Circuit Court of Appeals considered a case in which the allegedly false claims were presented to Amtrak, not to the government. *Totten*, 380 F.3d at 491. The court held that, because Amtrak was not an agency or instrumentality of the government, presenting a claim presented to Amtrak was *not* presenting a claim to an officer or employee of the government within the meaning of § 3729(a)(1). *Id.* at 492. The court also rejected the plaintiff's contention that submitting a claim to Amtrak was *effectively* submitting a claim to the government, because the claim was to be paid with funds that Amtrak received from the government. *Id.* The court reasoned that such an argument would read out of § 3729(a)(1) the unambiguous requirement that the claim be presented "to an officer or employee of the United States Government." *Id.*

The court in *Totten* also rejected the plaintiff's argument that imposing such a limited reading of the "presentment" requirement in § 3729(a)(1) would be contrary to the definition of "claim" in § 3729(c), reasoning as follows:

It is quite easy to square the language of Section 3729(c) - including *both* "if" clauses - with the presentment requirement in Section 3729(a)(1). The first "if" clause defines a claim to include claims submitted to grantees if the Government "provides" any portion of the funds used to pay the claim. In a rhetorical sleight of hand, the Government urges that this clause must reach any claim where the money " *has already been* or is being provided by the Federal Government." *Id.* (emphasis added). Such a reading equates the present-tense "provides" in the statute with the past-tense "has provided" in the argument - and thereby runs afoul of the Supreme Court's admonition that "Congress' use of a verb tense is significant in construing statutes." *United States v. Wilson,* 503 U.S. 329, 333, 112 S. Ct. 1351, 1353-54, 117 L. Ed. 2d 593 (1992).

The word "provides" in Section 3729(c), when appropriately limited to the present tense, squares neatly with a presentment requirement. False Claims Act liability will attach if the Government *provides* the funds to the grantee *upon presentment of a claim* to the Government. Liability will also attach if, after the grantee presents the claim, the Government *provides* the funds directly to the claimant: the first "if" clause of subsection (c) - unlike the second - does not circumscribe the set of possible recipients of the federal funds. And under the second "if" clause, liability will attach if the Government - again, upon presentment of the claim - reimburses the grantee for funds that the grantee has already disbursed to the claimant. Nothing about the language of subsection (c) requires ignoring that of subsection (a)(1) to make sense of the statute.

Indeed, Totten and the United States never connect the dots in their argument based on subsection (c). *Whatever that argument may show about what constitutes a "claim," it does not respond to the plain requirement of subsection (a)(1) that, to be actionable under the False Claims Act, any such claim must be presented to an officer or employee of the United States Government.* As Judge Randolph noted in *Totten I,* it is clear on the face of the statute that "no matter how 'claim'

25

is defined, subsection (a)(1) requires the alleged false claimant
to present it (or cause it to be presented) to a federal officer or
employee." 286 F.3d at 554 (Randolph, J., concurring).

*Totten*, 380 F.3d at 493 (footnote omitted; emphasis added).

The court in *Totten* concluded, next, that the plain meaning of § 3729(a)(1), which requires that the claim be "presented" to an officer or employee of the United States, must control over the plaintiff's assertions that the court's reading would result in a variance with the legislative history of the 1986 Amendments, because legislative history could not change the plain meaning of the statute. *Id.* at 493-95. The court declined to address the question of whether Congress "forgot" to take out "the presentment requirement" in § 3729(a)(1) when it amended the definition of "claim" in § 3729(c), because it was not the province of the court to do so. *Id.* at 496.

Thus, according to *Totten*, "presenting" a false claim to a grantee of government funds is not "presenting" a false claim to an officer or employee of the government. In the present case, the government has alleged, and its evidence tends to prove, only that Hawley "presented" or "caused to be presented" false claims to NCCI, which were paid by NCCI, then NCCI was reimbursed by the FCIC, the government instrumentality. Under *Totten*, that is not enough to sustain a claim under § 3729(a)(1).

The government contends, however, that *Totten* has been rejected by other courts, citing *United States ex rel. Sanders v. Allison Engine Co., Inc.*, 471 F.3d 610 (6th Cir. 2006). This court does not find that *Sanders* undermines the pertinent portion of the *Totten* decision discussed above. In *Sanders*, the Sixth Circuit Court of Appeals addressed a contention that the trial court had erred by holding that liability under the FCA requires a showing that a false or fraudulent claim was *presented to the government*, either by the defendants or by a prime contractor. *Sanders*, 471 F.3d at 614. The court noted that

"[o]nly subsection (a)(1) of the statute makes any mention of presenting a claim to the government or Armed forces," but "[s]ubsections (a)(2) and (a)(3), which are separate bases for liability, contain no such presentment language." *Id.* at 614-15. After extensive analysis, the court concluded that subsections (a)(2) and (a)(3) are not limited to claims presented to the government, and that the *Totten* decision was wrong to the extent that it read such a presentment requirement into those subsections, but the court in *Sanders* never rejected the *Totten* court's reading of subsection (a)(1) as limited to claims presented to a government official or employee. *Id.* at 615-22.

The court in *Sanders* found that the distinctions among the subsections of § 3729(a) were a matter of "plain meaning":

> [T]he plain language of subsections (a)(2) and (a)(3) simply does not require that a claim must be presented to the government to be actionable. Congress could have chosen to include the presentment language of subsection (a)(1) in other parts of the FCA and did not. The Supreme Court has consistently counseled against attributing the same meaning to different language in the same statute. *See Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 452, 122 S. Ct. 941, 151 L. Ed. 2d 908 (2002) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation marks omitted); *Russello v. United States,* 464 U.S. 16, 23, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983) ("We refrain from concluding [ ] that the differing language in two subsections has the same meaning in each."). Moreover, reading presentment into subsection (a)(2) would give it almost the same meaning as subsection (a)(1), rendering the latter largely superfluous. *See Totten,* 380 F.3d at 507 (Garland, J., dissenting). The "cardinal principle of statutory construction," however, is "to give effect, if possible, to every clause and word of a statute rather than to emasculate an entire

> section." *Bennett v. Spear,* 520 U.S. 154, 173, 117 S. Ct.
> 1154, 137 L. Ed. 2d 281 (1997) (internal citations, quotations,
> and alterations omitted). The FCA cannot be read so as to
> make the meanings of subsections (a)(1) and (a)(2)
> indistinguishable.

*Sanders*, 471 F.3d at 616. This court, likewise, recognized above the principle that the differences in language among the first three subsections of § 3729(a) must be assumed to give those subsections different meanings. The court in *Sanders* ultimately held "that while liability under § 3729(a)(1) turns on whether a claim has been presented to the government, subsections (a)(2) and (a)(3) do not require such a showing," thus agreeing with the portion of *Totten* that is pertinent for present purposes. *Id.* at 622. In so holding, the Sixth Circuit Court of Appeals held that the remedial purposes of the FCA, described in *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968), were not contrary to its reading of subsection (a)(1), because subsections (a)(2) and (a)(3) provided broader scope to the FCA than subsection (a)(1), thereby serving the remedial purposes of the FCA as a whole. *Id.* at 618-21.[4]

Thus, contrary to the government's assertions, *Sanders* does not reject the "presentment" requirement *for § 3729(a)(1) claims* as defined in *Totten*, nor has the government presented any other convincing reason for rejecting the construction of that requirement in *Totten*. Indeed, this court finds that the "presentment" requirement for a claim pursuant to § 3729(a)(1), as defined in *Totten* and *Sanders*, is in keeping with the plain meaning of that statutory provision. Thus, the government must prove that Hawley

---

[4]The Sixth Circuit Court of Appeals noted that a plaintiff might still choose to bring a claim under subsection (a)(1), despite its "presentment" requirement, rather than use the apparently "more lenient" subsection (a)(2) for all claims, because subsection (a)(2) contains its own "more burdensome requirement" that the claim must actually have been paid, which subsection (a)(1) does not require. *Sanders*, 471 F.3d at 671.

presented a claim or knowingly assisted another to present a claim to an officer or employee of the United States Government or a member of the Armed Forces of the United States for payment or approval. 31 U.S.C. § 3729(a)(1).

Again, the government has alleged, and its evidence tends to prove, only that Hawley "presented" or "caused to be presented" false claims to NCCI, which were paid by NCCI, then NCCI was reimbursed by the FCIC, the government instrumentality. Under *Totten* and *Sanders*, that is not enough to sustain a claim under § 3729(a)(1), as a matter of law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 322; *In re Temporomandibular Joint*, 113 F.3d at 1492. Under the circumstances, the government cannot meet its burden of proof on the first element of its § 3729(a)(1) claim as a matter of law and, consequently, Hawley, not the government, is entitled to summary judgment on that claim.[5]

### 3. The "false record or statement" claim pursuant to § 3729(a)(2)

#### a. Elements of the claim

In **Count Two**, the government asserts a second FCA claim, this time pursuant to § 3729(a)(2). Section 3729(a)(2) imposes liability on one who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2). The Seventh Circuit Court of Appeals has identified the elements of a § 3729(a)(2) claim as the following: "'(1) the defendant made a statement in order to receive money from the government,

---

[5]Because the court finds that the government's § 3729(a)(1) claim fails as a matter of law on the "presentment" requirement, the court does not reach the parties' disputes concerning the "claim" requirement or the "knowledge" element of such a claim.

(2) the statement was false, and (3) the defendant knew it was false.'" *United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 741 (7th Cir. 2007) (quoting *United States ex rel. Crews v. NCS Healthcare of Illinois, Inc.*, 460 F.3d 853, 856 (7th Cir. 2006), in turn quoting *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005)). As mentioned above, the Sixth Circuit Court of Appeals has recognized that § 3729(a)(2) does not require proof that the false record or statement was presented to the government, but it does require proof that the false claim to which the false record or statement related was actually "paid or approved" by the government. *Sanders*, 471 F.3d at 617-18.

### b.  *The government's § 3729(a)(2) claim*

The government contends that there is no genuine dispute that the insurance applications, acreage reports, and production worksheets were false, in light of Kluver's plea agreement, the Windquists' pretrial diversion agreements, and Ed Marshall's settlement agreement. As to Hawley's knowledge of the falsity of these "reports or statements"—a matter not reached in the court's analysis of the government's § 3729(a)(1) claim in this case—the government contends that Hawley knew that Donald Kluver was the true owner of the crop on the South Dakota Crop Land in 2000, because, for example, Russell Hawley and Kluver were longtime friends, they had had various business dealings, Hawley had put a private hail insurance policy on the South Dakota Crop Land in Kluver's name, and Hawley knew or should have known that Ag Services was financing farming operations on the South Dakota Crop Land in the name of Donald Kluver, because Hawley had discussions with the Ag Services lender and was in possession of assignments of indemnities from the Windquists. The government also alleges that, even though most of the documents were not signed in Hawley's presence, a "quick look" at the crop insurance

documents would have revealed that the Windquists' signatures were forged, for example, because Sydney Windquist's first name was misspelled "Sid."

Similarly, the government argues that, for the 2001 crop, Hawley knew or should have known that the application from Ed Marshall provided by Hoffman was false. The government points out that Russell Hawley also had a long history with the Hoffmans and knew that they were in financial trouble and under criminal investigation; that Hawley should have known that Hoffman was the true operator of the South Dakota Crop Land in 2001, even though Hawley had been told that the Hoffman's 19-year-old son was going to custom farm the crop land; and Russell Hawley had never met Marshall and Hawley knew or should have known that Marshall did not sign the crop insurance application prior to the March 15, 2001, deadline.

Hawley, however, denies that the government has established the "knowledge" element of its § 3729(a)(2) claim as a matter of law. Among other things, Hawley contends that the federal crop insurance and private hail insurance policies for 2000 were not for the "same" land, because the crop insurance policies insured only the land in Tripp County, while the private hail insurance policies insured both the Tripp County farmland and the Melette County farmland. Hawley also contends that the federal crop insurance policies preclude custom farmers from purchasing such insurance, but the private hail policies do not, so that Kluver could have had an insurable interest for purposes of the private hail insurance policies, even if he did not have an insurable interest for purposes of the federal crop insurance. Hawley also contends that he reasonably believed that the Windquists had experience in farming and had a valid farming arrangement with Kluver, in the form of a lease or sublease, under which Kluver was going to provide the necessary equipment and inputs and perform custom farming operations, with both the Windquists and Kluver obtaining financing for the farming operation.

Similarly, Hawley contends that, in 2001, Russell Hawley knew that Mark and Sue Hoffman, as well as others, wanted to farm the South Dakota Crop Land, if they could obtain adequate financing. As of the closing date for federal crop insurance, March 15, 2001, anyone who expected to have an insurable interest in the crop could apply for the insurance, so when Mark Hoffman hand-delivered an application apparently signed by Ed Marshall, the owner of the South Dakota Crop Land, on March 14, 2001, Hawley had no reason to be suspicious, especially when Hoffman indicated that Marshall would be farming the land, if no one else could obtain financing to lease it. Hawley points out that it faxed or mailed Marshall "new producer" forms and information, and Marshall faxed them back, indicating that he was the producer on the South Dakota Crop Land, which he presumably would not have done, if he had not signed the application for crop insurance. Hawley also contends that there was no reason for him to be suspicious when Hoffman decided to purchase private hail insurance on the crop for 2001, when Marshall was only able to purchase federal crop insurance for the land in Tripp County, but not Melette County, because by doing so, Hoffman avoided a risk of non-payment for custom farming operations. Thus, Hawley contends that it reasonably believed that Hoffman and Marshall both had insurable interests for their respective forms of insurance. Hawley also argues that the government has failed to support its contentions that "regulations" required Hawley to "verify" or "certify" any of the information on any of the applications, records, or statements at issue for this claim.

The court's review of the record reveals that, as in *Taber Extrusions*, the evidence concerning the "knowledge" element is subject to genuine issues of material fact. *See Taber Extrusions, LP*, 341 F.3d at 845-46. As in *Taber Extrusions*, "[t]he government certainly has evidence creating the requisite inference" that Hawley knew the records or statements in question were false, recklessly disregarded the truth or falsity of the records

or statements, or was deliberately ignorant of their truth or falsity. *Cf. id.* at 845. At the same time, Hawley has presented contrary evidence. *Id.* As in *Taber Extrusions*, "[d]epending on factors such as witness credibility, a reasonable jury might find" either that Hawley did or did not have the requisite knowledge. *Id.* at 846. As the court noted in *Taber Extrusions*, "Particularly when the issue turns on the defendant's intent or scienter, summary judgment for the plaintiff is inappropriate." *Id.* The genuine issues of material fact on the "knowledge" requirement here are sufficient to deny the government's motion for summary judgment on its (a)(2) claim.

Turning to Hawley's motion for summary judgment on this claim, Hawley also asserts that the government cannot, as a matter of law, prove that Hawley made, used, or caused to be made or used, any of the records or statements at issue in **Count Two**, because the forms merely passed through Hawley's office, or were prepared and submitted by the purported insureds and adjusters without any participation by Hawley. Hawley argues that only the insurer verified any information and made the decision to issue policies and pay claims. Hawley also contends that its actions did not cause the government's damages, because the government would have sustained identical losses, had the true persons with an interest in the South Dakota Crop Land been identified in the paperwork on which the government's § 3729(a)(2) claim is based. Finally, Hawley contends that the government has recovered all of its damages from any false claims from the Windquists and Marshall. Therefore, Hawley contends that it is entitled to summary judgment on the government's § 3729(a)(2) claim on these further grounds.

In response, the government contends that Hawley owed NCCI a fiduciary duty, which makes Hawley liable for the submission of the false documents. The government also contends that Hawley accepted, signed, and submitted to NCCI applications for persons not eligible for crop insurance and signed and submitted other documents on the

basis of which crop loss claims were paid. The government also contends that it has not recovered from other bad actors the treble damages to which it is entitled under the FCA and for which Hawley is jointly and severally liable with those other bad actors. Therefore, the government contends that it is not estopped by any other parties' settlement from recovering damages from Hawley.

The court finds, first, that the insurance applications and acreage reports are the only documents related to the crop insurance claims for which the government has generated a genuine issue of material fact that Hawley signed, submitted, or participated in submitting. The court finds, however, that the government has generated genuine issues of material fact that those documents were "made" or "used" to get false or fraudulent claims for crop insurance benefits and premium subsidies paid or approved by the government, where submission of these documents was part of a multi-stage process leading to payment of claims. 31 U.S.C. § 3729(a)(2) (requiring that the report or statement be "made" or "used" to get the false or fraudulent claim paid or approved by the government); *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. 2005) (recognizing that, even in a multi-stage process to obtain a benefit from the government, a party that "uses" a document at one stage to proceed to the next stage has "used" the first-stage document to get a benefit paid or approved by the government within the meaning of § 3729(a)(2)); *accord United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1173-74 (9th Cir. 2006) (agreeing with the analysis in *Main*). The more difficult question, however, is whether *Hawley* "made" or "used" these documents or "caused" them to be made or used.

Hawley contends that he merely transmitted the documents, but did not certify or guarantee the accuracy of any information in them. The government counters that Hawley signed and submitted the documents—and at various points in its briefs, contends that

Hawley "verified" and "certified" or was required to "verify" or "certify" them—knowing that the documents were required steps to obtain crop insurance benefits, so that he also "used" or "made" them, or at the very least, "caused" them to be "made" or "used." The parties have provided differing expert opinions concerning the obligations of the crop insurance agent to verify the contents of the documents submitted to obtain crop insurance. The court finds, however, that the record gives rise to genuine issues of material fact that the crop insurance applications and acreage reports could not have been submitted without an agent's signature, even if the agent was not required to "verify" or "certify" the accuracy of the contents of the documents in question. Therefore, if the agent's signature is, indeed, required, and the agent provides the required signature, it appears to the court that the agent has, at the very least, "caused" the documents in question to be "made" or "used" to obtain from the government the payment or approval of the claim in question, within the meaning of § 3729(a)(2).

Hawley's liability, however, turns on proof that he not only provided necessary signatures on false documents, but that he also knew that the documents were false. *See Fowler*, 496 F.3d at 741 (a § 3729(a)(2) claim requires proof that the defendant made or used false documents or caused false documents to be made or used, that the documents were false, and that the defendant knew that they were false). The court's conclusion that an insurance agent can be held liable under § 3729(a)(2) if the insurance agent's assistance in submitting certain documents is required to complete a claim, and the agent knows the documents in question are false, is in keeping with the conclusion of the Eighth Circuit Court of Appeals that, "[w]ithout question, the first three subsections of 31 U.S.C. § 3729(a) are broad enough to 'reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government.'" *Taber Extrusions, LP*, 341

F.3d at 845 (quoting *Marcus*, 317 U.S. at 544-45). Signing and submitting the documents in question, knowing them to be false, appears to the court to be precisely the sort of "knowing assistance" in the fraud by a person with no direct contractual relations with the government that Congress and the Eighth Circuit Court of Appeals were contemplating. Therefore, Hawley is not entitled to summary judgment on the government's § 3729(a)(2) claim on the ground that he did not "make," "use," or "cause" to be "made" or "used" any of the insurance applications and acreage reports, if he signed them, but did not "verify" or "certify" them.

The court also finds insufficient Hawley's contention that he is entitled to summary judgment on this claim on the ground that the government cannot prove that Hawley caused the government's damages, because the government would have sustained identical losses, had the true persons with an interest in the South Dakota Crop Land been identified in the paperwork on which the government's § 3729(a)(2) claim is based. Such an argument is too clever by half. The question is not whether the government would have paid or approved the same claim submitted *by somebody else* on the basis of the same documents submitted *by somebody else*, but whether the government actually paid the claim actually submitted on the basis of the false documents submitted by the persons who actually submitted them. 31 U.S.C. § 3729(a)(2) (prohibiting making or using a false record or statement to get a false or fraudulent claim paid or approved by the government); *Sanders*, 471 F.3d at 618 (for a § 3729(a)(2) claim, the government must actually have paid or approved the false or fraudulent claim). The court also finds that the government has generated genuine issues of material fact that the disposition of the criminal cases against Kluver and the Windquists and the settlement with Ed Marshall did not fully compensate the government for damages and penalties to which it may be entitled for

submission of false claims. Thus, there is no bar in the present record to the government's ability to prove the "damages" element of its § 3729(a)(2).

Therefore, the court concludes that, like the government, Hawley is not entitled to summary judgment on the FCA claim pursuant to § 3729(a)(2) in **Count Two**.

### 4.    *The "conspiracy" claim pursuant to § 3729(a)(3)*

#### a.    *Elements of the claim*

In **Count Three**, the government asserts a third FCA claim, this time pursuant to § 3729(a)(3). Section 3729(a)(3) imposes liability on one who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(3). Like subsection (a)(2), subsection (a)(3) does not require proof of "presentment" of the claim to an officer or employee of the United States. *Sanders*, 471 F.3d at 616 & 618. Subsection (a)(3), however, addresses the distinct conduct of conspiring to defraud the government using false claims. *Id*. at 618. The Eleventh Circuit Court of Appeals has stated that, to establish a claim under subsection (a)(3), the plaintiff must show the following: "'(1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim.'" *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (quoting *United States ex rel. Stinson v. Provident Life & Accident Ins. Co.*, 721 F. Supp. 1247, 1259 (S.D. Fla. 1989)). These elements comport with the elements that the Eighth Circuit Court of Appeals has stated, more generally, for proof of a "civil conspiracy." *See In re Temporomandibular Joint (TMJ) Implants Prods. Liability Litig.*, 113 F.3d 1484, 1498 (8th Cir. 1997) (*TMJ Implants*) ("To establish a civil conspiracy, plaintiffs must show five elements: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object

or course of action to be taken; (4) the commission of one or more unlawful overt acts; and (5) damages as the proximate result of the conspiracy.").

### b. The government's § 3729(a)(3) claim

The government contends that it can establish all of the elements of its FCA conspiracy claim as a matter of law, so that it is entitled to summary judgment on this claim. Hawley, on the other hand, contends that the government has presented no competent evidence of the necessary agreement or meeting of the minds, so that Hawley is entitled to summary judgment on this claim. The Eighth Circuit Court of Appeals has recognized that, "[w]ithout evidence of specific facts tending to show an agreement or a 'meeting of the minds' and concerted action, a plaintiff seeking to show a civil conspiracy cannot survive a defendant's summary judgment motion." *TMJ Implants*, 113 F.3d at 1498.

The government contends that it has presented evidence of an agreement or meeting of the minds, because each of the alleged conspirators gained something from the false claims for crop insurance, including Hawley, which obtained substantial commissions on the policies; because Hawley's involvement was instrumental in the scheme to defraud the government, where without him, the other conspirators would not have been able to obtain federal crop insurance coverage; and because it has presented evidence suggesting (the government argues proving) that Hawley accepted, signed, and submitted the crop insurance documents when he knew or should have known that the documents were false or while recklessly disregarding whether or not they were false, which shows that he was not simply a dupe for the other conspirators, but a knowing participant in the fraudulent scheme. The court finds that the evidence to which the government points is sufficient to generate genuine issues of material fact that Hawley knowingly participated in a scheme, involving both a "meeting of the minds" and "concerted action," to allow ineligible

persons to obtain and make claims against federal crop insurance, but far from sufficient to establish the government's FCA conspiracy claim as a matter of law. *Cf. id.* (summary judgment on a civil conspiracy claim is appropriate if there is no evidence tending to show a meeting of the minds and concerted action). Therefore, neither party is entitled to summary judgment on this claim.

### C.  The Common Law Claims

Hawley seeks summary judgment on the government's common law claims. Again, those claims are for common law fraud or concealment and for "payment under mistake of fact." The court will consider whether summary judgment in Hawley's favor is appropriate on these claims in turn.

#### 1.  The fraud claim

##### a.  Elements of the claim

In **Count Four**, the government alleges that the defendants engaged in common-law fraud by making or using false records and statements or by concealing the true facts surrounding the individuals actually owning the farmland on which MPCI policies were issued and claims were made, knowing that the misrepresentations or concealments were material and knowing and intending that the United States would rely upon them, thereby causing the United States damages. Hawley contends that the government cannot establish this claim as a matter of law.

Hawley asserts that the elements of common law fraud are set forth in RESTATEMENT (SECOND) OF TORTS § 525, which states the following:

> One who fraudulently makes a misrepresentation of fact,
> opinion, intention or law for the purpose of inducing another
> to act or to refrain rom action in reliance upon it, is subject to

> liability to the other in deceit for pecuniary loss caused to him
> by his justifiable reliance upon the misrepresentation.

Similarly, the government cites *Beeck v. Kapalis*, 302 N.W.2d 90 (Iowa 1981), for the following comparable elements of common law fraud:

> The elements of fraud are: (1) a material misrepresentation (2) made knowingly (scienter) (3) with intent to induce the plaintiff to act or refrain from acting (4) upon which the plaintiff justifiably relies (5) with damages.

*Beeck*, 302 N.W.2d at 94 (citing, *inter alia*, RESTATEMENT (SECOND) OF TORTS § 525). This court has, likewise, identified the following as the elements of a fraud claim for damages under Iowa law:

> (1) a representation by the opposing party, (2) falsity of the representation, (3) scienter (*i.e.*, knowledge of falsity), (4) intent to deceive, (5) materiality of the misrepresentation, and (6) justifiable reliance by the claimant upon the representation, resulting in injury to the claimant.

*McLeodUSA Telecomm. Servs., Inc. v. Qwest Corp.*, 469 F. Supp. 2d 677, 705 (N.D. Iowa 2007) (citing *Smidt v. Porter*, 695 N.W.2d 9, 22 (Iowa 2005)). This court has also recognized that, in the case of an alleged fraudulent non-disclosure or concealment, the first element is that the defendant made a false representation or concealed a material fact when under a legal duty to disclose that fact. *Id.* at 707.

### b.    *Hawley's challenges to the claim*

Hawley challenges the government's common law fraud claim on two grounds: First, he argues that he did not make or "certify" the truth of any of the allegedly false statements upon which the claim is based. Second, he argues that the government cannot, as a matter of law, prove "justifiable reliance," where the documents containing supposedly false information to which the farmers had certified were never received by the

government, but were, instead, received and acted on by the private insurance provider. The government responds to Hawley's first contention by pointing out that, according to applicable FCIC Policies and Procedures, the crop insurance agent must ensure that the person who signs the corp insurance application has a bona fide share in the insured crop. As to Hawley's second contention, the government contends that the government relied on NCCI to request reimbursement of only valid claims and that it was reasonable for the government to rely on submissions by the insurance agent in paying crop insurance claims, where the government relied on private insurance companies and their agents to sell and service federal crop insurance. The government argues that privity of contract is not required to prove justifiable reliance on information provided by the defendant.

The court finds that, based on the record presented, the government's fraud claim in **Count Four** is in essence, or primarily, a fraudulent non-disclosure or concealment claim. This court has set out the requirements of the non-disclosure or concealment element of such a claim as follows:

> [W]here the fraud was purportedly a nondisclosure or concealment, the claimant must show that the alleged tortfeasor was under a legal duty to communicate the withheld information to prevail (or must so plead to state a claim). *See, e.g., Schaller Tel. Co. v. Golden Sky Sys., Inc.,* 139 F. Supp. 2d 1071, 1104 (N.D. Iowa 2001) (summarizing Iowa law on fraudulent misrepresentation and fraudulent nondisclosure). Iowa cases have not provided a specific test for determining when a duty to disclose arises in fraudulent nondisclosure cases. *See Clark,* 546 N.W.2d at 592 (citing *Sinnard v. Roach,* 414 N.W.2d 100, 106 (Iowa 1987)); *Arthur v. Brick,* 565 N.W.2d 623, 625 (Iowa Ct. App. 1997). They have, however, observed that, to prove the necessary duty to disclose, the plaintiff need not show a fiduciary duty existed, but may, instead, establish that a duty arose from "inequality of condition and knowledge, or other circumstances shown by

41

a particular fact situation." *Irons v. Community State Bank,* 461 N.W.2d 849, 854 (Iowa Ct. App. 1990); *see Schaller Tel. Co. v. Golden Sky Sys., Inc.,* 298 F.3d 736, 740 (8th Cir. 2002) (noting that, under Iowa law, a duty to reveal arises when "'one with superior knowledge, dealing with inexperienced persons who rely on him or her, purposely suppresses the truth respecting a material fact involved in the transaction.'") (quoting *Clark,* 546 N.W.2d at 592). Thus, "for concealment to be actionable, the representation must relate to a material matter known to the party . . . which it is his legal duty to communicate to the other contracting party whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances." *Clark,* 546 N.W.2d at 592; *Sinnard,* 414 N.W.2d at 105 (stating the same standard). The Iowa Supreme Court "has recognized a duty to disclose in situations where the plaintiff and the defendant were involved in some type of business transaction, such as buyer/seller or owner/contractor," but only when the relative knowledge and experience of the parties warrants. *Wright v. Brooke Group, Ltd.,* 652 N.W.2d 159, 174 (Iowa 2002) (citing cases). The duty to disclose may also arise "from the 'attendant circumstances,' such as a 'contrivance intended to exclude suspicion and prevent inquiry.'" *Id.* at 175 (quoting *Wilden Clinic, Inc. v. City of Des Moines,* 229 N.W.2d 286, 293 (Iowa 1975), in turn quoting 37 Am.Jur.2d, *Fraud and Deceit* § 145 (1968), and involving a dispute between a buyer and seller of land).

*McLeodUSA Telecomm. Servs., Inc.*, 469 F. Supp. 2d at 707-08.

The court finds that the government has generated genuine issues of material fact on this element of its common law fraud claim. The requisite legal duty to disclose the ineligibility of the applicants for crop insurance—and the court has already determined, in reference to the FCA claims, that there are genuine issues of material fact as to whether Hawley knew that the applicants were ineligible for crop insurance—may arise here in light

of evidence that a crop insurance agent such as Hawley has superior knowledge about the applicants for such insurance, as compared to the FCIC. *Id.* The duty to disclose may also arise from the attendant circumstances, including the applicable FCIC Policies and Procedures, which would have required the insurance agent to attempt to determine whether the applicants had a bona fide interest in the crops to be insured. *Id.* Moreover, the court found, above, that the government had generated genuine issues of material fact on a "conspiracy" to defraud the government, in violation of the FCA, and the court finds that the same evidence generates genuine issues of material fact that Hawyley engaged in a contrivance intended to exclude suspicion and prevent inquiry for purposes of a fraudulent concealment claim. *Id.* Therefore, Hawley is not entitled to summary judgment on this claim on the ground that the government cannot, as a matter of law, prove fraudulent conduct on his part.

The court also finds that the government has generated genuine issues of material fact on the "justifiable reliance" element of its common law fraud claim, which Hawley also challenges here. As the Iowa Supreme Court has explained,

> Reliance is justified when a reasonably careful person would be justified in relying on the information supplied. Reliance is not justified if the person receiving the information knows or in the exercise of ordinary care should know that the information is false.

*Pollmann v. Belle Plaine Livestock Auction, Inc.*, 567 N.W.2d 405, 410 (Iowa 1997). Thus, a plaintiff cannot recover if he "blindly relies on a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Lockard v. Carson*, 287 N.W.2d 871, 878 (Iowa 1980); *accord* RESTATEMENT (SECOND) OF TORTS § 541 cmt. a (1977).

Hawley contends that the government cannot assert that it justifiably relied on any statements or records that he signed or submitted, because those statements or records were only submitted to NCCI, not the government. The Iowa Supreme Court encountered a similar argument in *Clark v. McDaniel*, 546 N.W.2d 590 (Iowa 1996). In *Clark*, the alleged tortfeasor also asserted that the plaintiffs, as third parties, did not justifiably rely on any representations that the alleged tortfeasor made to another. The Iowa Supreme Court concluded, however, that no direct contractual relationship is required between the alleged tortfeasor and the person who justifiably relies to his or her detriment on the alleged tortfeasor's representations, because "[u]nder Restatement (Second) of Torts section 533 (1977) [hereinafter Restatement], persons who fraudulently misrepresent the truth can be held liable to third parties if they have a 'reason to expect' their misrepresentation will be communicated to third parties." *Clark*, 546 N.W.2d at 593. More specifically, RESTATEMENT (SECOND) OF TORTS § 533 provides as follows:

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.

RESTATEMENT (SECOND) OF TORTS § 533; *see also Clark*, 546 N.W.2d at 593 (quoting this provision). As the Iowa Supreme Court explained, further,

> The maker's liability "includes those whom he has reason to expect [the misrepresentation] to reach and influence, although he does not make the misrepresentation with that intent or purpose." Restatement § 533 cmt. d. "Reason to expect" is defined objectively:

In order for the maker of a fraudulent misrepresentation to have reason to expect that it will reach third persons and influence their conduct it is not enough that he recognizes, or as a reasonable man should recognize, the risk that it may be communicated to them and they may act upon it. . . . When only pecuniary loss results, the magnitude of the extent to which misrepresentations may be circulated and the losses that may result from reliance upon them has induced courts to limit the liability to the narrower rule stated in this section.

Virtually any misrepresentation is capable of being transmitted or repeated to third persons, and if sufficiently convincing may create an obvious risk that they may act in reliance upon it. This risk is not enough for the liability covered in this section. The maker of the misrepresentation must have information that would lead a reasonable man to conclude that there is an especial likelihood that it will reach those persons and will influence their conduct.

Restatement § 531 cmt. d.

*Clark*, 546 N.W.2d at 593. In *Clark*, the Iowa Supreme Court expressly adopted § 533 and held, in the case then before the court, that a tortfeasor who made misrepresentations about a motor vehicle could reasonably expect that the misrepresentations would be communicated to and relied upon by a third party, so that the alleged tortfeasor could be liable for the fraud. *Id.* at 593-94.

In the present case, there are at least genuine issues of material fact that Hawley made misrepresentations, or failed to disclose misrepresentations, in the various documents it signed and submitted in support of crop insurance applications or claims; that those misrepresentations, although not made directly to the government, were made to NCCI; that Hawley intended or had reason to expect that the misrepresentations would be repeated

45

or their substance communicated to the government; and that those misrepresentations would influence the government to reimburse NCCI for indemnity payments and to pay crop insurance premium subsidies. RESTATEMENT (SECOND) OF TORTS § 533; *Clark*, 546 N.W.2d at 593. The record shows that Hawley knew, from his prior employment as an adjuster for NCCI and from his role as a crop insurance agent, that the government subsidized crop insurance indemnity payments and premiums based on information provided to the private insurer. These are circumstances in which there are at least genuine issues of material fact that the maker of the misrepresentation or concealer of the falsity of the misrepresentations, Hawley, had information that would lead a reasonable man to conclude that there was an especial likelihood that the false documents would reach the government, even though the government was a third party to the crop insurance contracts, and that the false documents would influence the government to reimburse indemnity payments and pay premium subsidies. *See Clark*, 546 N.W.2d at 593 (quoting with favor this standard from RESTATEMENT (SECOND) OF TORTS § 531 cmt. d). Therefore, Hawley is not entitled to summary judgment on the government's common law fraud claim on the ground that the government cannot show justifiable reliance upon misrepresentations purportedly made only to NCCI.

Hawley's motion for summary judgment on the government's common law fraud claim, thus, will be denied.

### 2.    *The "payment under mistake of fact" claim*

In **Count Five**, the government asserts a claim of "payment under mistake of fact" alleging that the United States paid crop insurance indemnities and premium subsidy benefits under the erroneous belief that the persons receiving those benefits were eligible for them, causing the United States damages. As relief on this claim, the government seeks damages, plus interest and costs. Hawley contends that this claim fails as a matter

of law, because the government has not alleged that there was a contract between Hawley and the government. The government responds that Hawley was the agent of NCCI, which did have a direct contractual relationship with the government through the Standard Reinsurance Agreement, and that Hawley has made only a legal challenge to the claim, not a factual one.

Neither party cites any law whatsoever in support of its argument concerning this claim. There are hints in Iowa cases that a "mistake of fact" may be a ground for reformation or rescission of a contract, an equitable action for restitution, or an action for damages. *See, e.g., Sioux County State Bank v. Veenstra*, 372 N.W.2d 309, 311-12 (Iowa Ct. App. 1985) (reformation); *Binkholder v. Carpenter*, 260 Iowa 1297, 1304-05, 152 N.W.2d 593, 598 (1967) (finding that the remedy for a mutual mistake of fact is not limited to reformation of the contract or damages, but may include rescission, although the court did not decide that an action for damages was available); *National Fire Ins. Co. of Hartford v. Butler*, 260 Iowa 1159, 1163, 152 N.W.2d 271, 274 (1967) (restitution); *see also Barnard v. Cedar Rapids City Cab Co.*, 257 Iowa 734, 741, 133 N.W.2d 884, 890 (1965) ("Our cases have long held a contract may be set aside for a mutual mistake of a material fact and a release is no different than any other contract."). The government does not appear to seek reformation or rescission of any contract. Instead, it prays for "damages" for mistake of fact. Notwithstanding the government's description of its remedy as "damages," the authority that most nearly matches the government's allegations describes the appropriate remedy as "restitution": "'A person who has paid another an excessive amount of money because of an erroneous belief induced by a mistake of fact that the sum paid was necessary for the discharge of a duty, for the performance of a condition, of for the acceptance of an offer, is entitled to restitution of the excess.'" *Reeves v. Better Taste Popcorn Co.*, 246 Iowa 508, 515, 66 N.W.2d 853, 857 (1955)

(quoting RESTATEMENT OF THE LAW ON RESTITUTION § 20). Restitution plainly cannot be obtained from someone who did not receive the excessive payment. Moreover, in each of the cases discussing remedies for mistake of fact, the remedy was sought against the other party to the contract, that is, the party who had received the excessive payment, not against an agent of that party or a third party. In the absence of any authority supporting the government's contention that it is entitled to recover on a theory of "payment under mistake of fact" from an agent of a party with whom it contracted or from a third party, instead of from the party or parties to whom or for whom payments were made (NCCI or the insureds), the government's "mistake of fact" claim fails as a matter of law.

Therefore, Hawley is entitled to summary judgment on the government's claim of "payment under mistake of fact" in **Count Five**.

### III.  CONCLUSION

Upon the foregoing,

1.      The government's December 28, 2007, Motion For Summary Judgment Or In The Alternative Partial Summary Judgment (docket no. 16) is **denied in its entirety**; and

2.      The defendants' December 28, 2007, Motion For Summary Judgment (docket no. 17) is **granted in part and denied in part**. More specifically, the defendants' motion is **granted** as to **Count One**, the FCA claim pursuant to 31 U.S.C. § 3729(a)(1) alleging

"presentation of a false claim," and as to **Count Five**, the common law claim for "payment under mistake of fact," but **denied** as to **Counts Two, Three,** and **Four**.

**IT IS SO ORDERED.**

**DATED** this 3rd day of April, 2008.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA